UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20363-RAR

**UNITED STATES OF AMERICA**

vs.

**ISSA ASAD
and
Q LINK WIRELESS LLC,**

      **Defendants.**
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States recognizes that it is bound by a plea agreement in this case to make certain sentencing recommendations. These recommendations include (1) a 60-month sentence for Issa Asad on Count 1, to run consecutively with what amounts to a 33-month sentence on Count 2, and (2) financial penalties and restitution for both Asad and his company Q Link Wireless LLC ("Q Link"), totaling $128,609,514, which are due to be satisfied by the date of the sentencing hearing. On top of that, Asad and Q Link have agreed to cease being federal telecommunication providers. These punishments are appropriately severe for the tremendous fraud scheme Asad perpetrated, and are consistent with the guideposts for sentencing under 18 U.S.C. § 3553(a).

In this memorandum, we describe the fraud scheme for the Court so that it understands why the parties have recommended the resolution that they have, and why the recommended punishments comport with § 3553(a). We also respond briefly to the defendants' objections to the presentence investigation report. We do not expect the sentencing hearing itself to take longer than an hour.

## RELEVANT FACTUAL SUMMARY

Asad and Q Link pleaded guilty to conspiring to defraud and commit offenses against the United States in connection with a years-long scheme to steal over $100 million from a federal program providing discounted phone service to people in need (Count 1). Asad, Q Link's CEO, also pleaded guilty to laundering money from a separate scheme to defraud a different federal program meant to aid individuals and businesses hurt by the Covid-19 pandemic (Count 2).

This case arose out of the Asad and Q Link's scheme to defraud the Federal Communication Commission ("FCC") Lifeline program. Lifeline makes basic communications services more affordable for low-income consumers. It provides subscribers a deep discount on qualifying monthly cellphone service, broadband Internet service, or bundled voice-broadband packages purchased from participating telecommunications providers. The discount helps ensure that low-income consumers can afford 21st century connectivity services and the access they provide to jobs, healthcare, and educational resources. Telecommunication companies like Q Link can then get reimbursed through the Lifeline program for providing services to qualifying customers, so long as Q Link made sure the customers were "using" the service (as defined in federal regulations meant to prevent fraud, waste and abuse in the program).

Q Link and Asad admitted the following factual basis for their pleas: Asad engaged in multiple tricks designed to mislead the FCC about how many people were using Q Link's Lifeline phones, and to prevent customers who did not want the phones from ending their relationship with Q Link (which would have prevented Q Link from billing the program for them). Q Link and Asad manufactured non-existent cellphone activity, and engaged in coercive marketing techniques to get people to remain Q Link customers. On one occasion, for example, the Asad devised the following automated script to be played for Q Link customers: "Hello, your Medicaid, Food Stamp

and Lifeline benefits are about to get cancelled. To avoid cancelation of these benefits, press 1 now to indicate that you wish to remain enrolled in these government programs. Press 2 if you wish to speak to a representative about your government benefits To opt out of any future calls, press 3." Q Linka and Asad used this false and threatening script to coerce customers into accepting Lifeline services. In another recorded call in which a similar script was deployed, a customer who called to cancel due to a non-working cellphone asked the Q Link customer service representative "do you want me to throw it in the garbage?" The representative responded instead: "Just make sure you continue to use the device at least once every 30 days."

Upon learning that the FCC was investigating their Lifeline billing, Q Link and Asad created and provided false records to the FCC to conceal the scam and to continue collecting reimbursement. As part of this plan, they simply manufactured cellphone activity on behalf of Q Link customers who were not using their cellphones. At no point did Q Link amend past Lifeline claims for customers who were not using their cellphones or return any of the Lifeline payments (something they could have done).

On top of all of this, Asad defrauded another federal government program, the Paycheck Protection Program ("PPP"), by making false statements about Q Link's business. Asad, in Q Link's name, executed a fraudulent scheme to obtain, and keep, PPP proceeds. To further the scheme, Assad made false statements about Q Link's business, including a false claim that Q Link's Lifeline reimbursements substantially decreased because of the pandemic. Q Link's Lifeline reimbursements did not. But Asad personally doctored financial documents that he submitted in support of his PPP loan making it appear as though his business suffered a large dip in revenue when it had not. Asad spent PPP loan proceeds on a Land Rover payment, his personal

3

Amex card, jewelry, and personal property taxes. a jewelry store and to pay the Asad's property taxes on his residence.

As part of the plea agreements, Asad and Q Link also agreed to pay jointly $109,637,057 in restitution to the FCC no later than the time of their sentencing hearings. Asad separately agreed to pay $1,758,339.25 in restitution to the United States Small Business Association by the time of sentencing, and to a forfeiture judgment against him of at least $17,484,118.00 (also paid by the time of sentencing).

## SUMMARY OF THE GUIDELINES CALCULATIONS

Under the plea agreements, the Government and Asad have an agreed-upon sentencing guideline range and sentencing recommendation.

As to Count 1 (conspiracy to commit wire fraud, theft of government funds, and interfere with the lawful function of the FCC, in violation of 18 U.S.C. § 371):

(a) <u>Base Offense Level</u>: Asad's base offense level is twelve (12), in accordance with U.S.S.G. § 2C1.1(a)(2);

(b) <u>Loss</u>: Asad's offense level shall be increased by twenty-four (24) levels pursuant to U.S.S.G. § 2B1.1(b)(1)(M) because the loss to the government was between $65,000,000 and $150,000,000, in accordance with U.S.S.G. § 2C1.1(b)(2); and

(c) <u>Obstruction of Justice</u>: Asad's offense level shall be increased by two (2) levels pursuant to U.S.S.G. § 3C1.1 because the Defendant obstructed or impeded the administration of justice with respect to the investigation or prosecution of the offense.

As to Count 2 (money laundering the proceeds of the paycheck protection program fraud, in violation of 18 U.S.C. § 1957):

    (a) <u>Base Offense Level</u>: Asad's base offense level is six (6), in accordance with U.S.S.G. § 2S1.1(a)(2);

    (b) <u>Loss</u>: Asad's offense level shall be increased by sixteen (16) levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I) because the loss to the victim was between $1,500,000 and $3,500,000; and

    (c) <u>1957</u>: Asad's offense level shall be increased by one (1) level pursuant to U.S.S.G. § 2S1.1(b)(2)(A) because the defendant was convicted of money laundering.

For Count 1, Asad's guidelines range with acceptance is Level 35 (168-210 months). For count 2, Asad's guidelines range with acceptance is Level 22 (33-42 months). The parties agree that this is a correct calculation of the guidelines. The parties also agreed to make a joint recommendation of 60 months, the statutory maximum on Count 1 (which would effectively score the guidelines down to a Level 25, as if Asad had pled to one count of § 371). The parties further agreed to run Asad's imprisonment on Count 2 concurrently with that on Count 1.[1]

As to Q Link, the company agreed to pay full restitution jointly and severally with Asad at the time of sentencing, and to cease being a Lifeline provider.

## DISCUSSION

### The Parties' Recommended Punishments Are Reasonable Under § 3553(a)

"[T]he district court must consider several factors [set forth in 18 U.S.C. § 3553(a)] to

---

[1] U.S. Probation arrived at the guidelines calculation a bit differently. The government is in discussions with U.S. Probation in the hopes that everyone can be on the same page by the time of the sentencing hearing. In the government's view, the PSR: 1) incorrectly scored Count 2 as the higher of the two guidelines in paragraph 56; and 2) included the wrong loss amount for Count 2 (it should be the amount of Asad's second draw on the PPP loan, $1.7 million and not $3.6 million) in paragraph 57. In any event, the Parties will be asking the Court to adopt their agreement on the Guidelines at the time of sentencing. The Government verbally ran this Guidelines calculation by the duty U.S. Probation officer before entering in the plea agreement and filing the information and the duty U.S. Probation officer agreed.

determine a reasonable sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims." *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (internal quotations and citations omitted).

This Court should place particular emphasis on four factors: the nature and circumstances of the offense, respect for the law, the need for deterrence, and the need to provide restitution to the victims. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (stressing that the sentencing court "is permitted to attach great weight to one factor over others" and that the "decision about how much weight to assign a particular sentencing factor [is] committed to the sound discretion of the district court.") (internal citations omitted).

### 1. The nature and circumstances of the offense.

Perhaps one of the more egregious aspects of this fraud scheme was Asad and Q Link's decision to load an auto dialer (falsely) threatening to take away people's Medicaid and Food Stamps if they didn't press 1 to agree to Q Link's services. This was an offense that made one person (Asad) incredibly wealthy by taking advantage of a Government program for low-income people in need. The sheer dollar amount and complexity of the fraud speaks to how hard it was to perpetuate and how hard it was to investigate. The nature and circumstance of this offense support a very serious sentence as the parties have agreed to here.

### 2. The seriousness of the offense.

It goes without saying that this is a serious offense. It is particularly egregious, and concerning, that Asad and Q Link did not self-report or pay back the defrauded funds when under regulatory investigation by the FCC. Similarly, committing pandemic fraud after committing a large procurement fraud is serious conduct and mitigates in favor of a serious sentence here.

### 3. The need for deterrence.

The Eleventh Circuit recently observed: "General deterrence is more apt, not less apt, in white collar crime cases." *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022). The reason is that "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity," which makes them "prime candidates for general deterrence." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (internal citations omitted). Courts have routinely noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense). As the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

It is the Government's view that a five year jail sentence and paid financial penalties in excess of $100 million will both deter Asad specifically and the telecommunications industry in

general. When it comes to assessing Asad's likelihood of deterrence, his actions in agreeing to plead to an information, avoid trial, and pay back the entirety of the estimated fraud loss should be taken into account by the Court. As for general deterrence, this case represents the largest criminal fraud perpetrated against the FCC, and it is important to impose punishments that demonstrate to other telecommunications providers benefitting from federal programs that fraud is not a cost of doing business and will be enforced criminally. A 5-year prison sentence, coupled with over $100 million in financial payments, does that.

### 4. The need to provide restitution to the victims.

This sentencing recommendation meets this sentencing factor completely, requiring Q Link and Asad to make full restitution by sentencing.

### 5. Pertinent policy statements and unwanted sentencing disparities.

The United States Sentencing Commission (the "Commission") issued a report on corporate criminal sentencing in August 2022.[2] The report, issued 30 years after the implementation of the chapter 8 organizational guidelines, sought to summarize and address corporate sentencing trends. According to the Commission, 53.1 percent of organizational offenders are charged alongside an individual co-defendant (leaving 46.9 percent or organizational defendants charged without an individual co-defendant). The Commission also analyzed whether high-level individuals, such as Asad, were charged alongside the organization. Starting in fiscal year 2009, with a few exceptions, high-level authority co-defendants constitute half or fewer of individual co-defendants.

Against this backdrop, and unlike this case, there are several examples of criminal corporate resolutions where no individual, let alone an executive, was held accountable. *See, e.g.,*

---

[2]https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220829_Organizational-Guidelines.pdf

*U.S.. v. Carlisle HMA, LLC*, 18-3CR00288 (a $260 million resolution). As this Court well knows, corporate cases can be difficult, time-intensive, and costly to bring. In one recent case in our District, the company entered into a deferred prosecution agreement and the individuals were prosecuted in Brazil but not here. *See U.S. v. Trafigura Beheer B.V.*, 23-CR-20476-Williams ($126 million resolution, comprised of a $80 million fine and $46 million forfeiture). There are, at the other end of the spectrum, cases with no corporate resolution but high-level authority defendants who go to trial, get convicted, pay no money back aside from whatever fraction was seized through government efforts, and receive very significant sentences. *See U.S. v. Patel,* 19-CR-80181-Ruiz (lab owner sentenced to 27 years after trial for submitting over $463 million in genetic tests that were not needed or procured by kickbacks); *see U.S. v. Singh*, 23-CR- Leibowitz ($153 million investment fraud, with owner sentenced to 23 years after trial); *see U.S. v. Esformes*, 16-CR-20549-Scola (nursing home chain owner sentenced to 20 years after trial in large-scale health care fraud).

This case brings those two not-always-satisfying outcomes together. It the government's view that this sentencing resolution, with over $128 million in paid financial penalties between a company and an individual, as well as a serious 5-year term of incarceration for the responsible executive, appropriately serves the statutory sentencing factors.

### **Defendant's PSR Objections**

To the extent that Asad intends to strike the entirety of any criminal history from the PSR, a sealed filing, the Government objects. The Probation Office has an obligation to report a defendant's criminal history accurately in a PSR. Nothing in the PSR is inaccurate to our knowledge on this subject. That said, should Asad want to supplement the PSR with any additional facts, the Government does not object. In any event, Asad's objections, to the extent that he is not

asking to strike criminal history entirely, have no bearing on his ultimate guidelines, so the Court need not resolve them.

### Restitution, Forfeiture and Fines

Assuming the defendants resolve restitution by the time of sentencing, the Government will not be seeking fines.  As it currently stands, it is the Government's view that the only victims for restitution purposes are the FCC and the SBA.  The Government did set up a website to allow individual Q Link customers to come forward and report any harm from the charged scheme.  The website is also updated with the time and date of the sentencing hearing.

### Asad's Surrender Date

The Parties are still working to finalize the restitution owed in this case.  Assuming Asad has made arrangements to pay restitution in full by the sentencing date, the Government will agree to allow him to surrender 60 days from the time of sentencing, or the day he receives his facility designation (whatever is earlier).

Dated:  July 15, 2025

Respectfully submitted,

HAYDEN O'BYRNE
UNITED STATES ATTORNEY

By:    /s/    Elizabeth Young
ELIZABETH YOUNG
JOHN C. SHIPLEY
Assistant United States Attorneys
Court ID No. A5501858
Elizabeth.Young@usdoj.gov
United States Attorney's Office
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (786) 761-3153